MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:    2014 ME 60
Docket:      Ken-13-71
Argued:      November 20, 2013
Reargued:    April 7, 2014
Decided:     April 22, 2014

Panel:       ALEXANDER, LEVY, SILVER, MEAD, and CLIFFORD, JJ.[*]

## LINDA J. CLIFFORD

v.

## MAINEGENERAL MEDICAL CENTER et al.

ALEXANDER, J.

[¶1]  This case arises from three emails that Linda J. Clifford sent to the Governor's office in late September 2007.  Those emails triggered a series of events that ultimately led to Clifford being detained overnight against her will in the psychiatric unit at MaineGeneral Medical Center (MaineGeneral) in Augusta.

[¶2]  Scott Kemmerer, an emergency room physician, appeals from an order of the Superior Court (Kennebec County, *Marden, J.*) partially denying consolidated motions to dismiss and for summary judgment[1] on Clifford's complaint. Clifford alleges that Kemmerer and MaineGeneral deprived her of

---

[*]  Chief Justice Saufley and Justice Gorman sat at the initial oral argument and participated in the Court's initial conference regarding this opinion immediately following that oral argument but did not participate further in the development of this opinion.

[1]  Because the Superior Court, as relevant to this appeal, appropriately treated the consolidated motions in effect as a motion for summary judgment, we evaluate the issues based on the parties' statements of material fact rather than on the pleadings.  *See, e.g., Hardenbergh v. Patrons Oxford Ins. Co.*, 2013 ME 68, ¶ 12 & n.2, 70 A.3d 1237.

2

liberty without due process and in violation of statutory rights, and subjected her to an unreasonable search, in violation of the Maine Civil Rights Act (MCRA), 5 M.R.S. § 4682(1-A) (2013).[2]

[¶3] Kemmerer contends that the court erred in denying his motion for summary judgment on the MCRA claims, arguing that he is entitled to absolute immunity against those MCRA claims by virtue of the immunity provided pursuant to the Maine Tort Claims Act (MTCA), 14 M.R.S. § 8111(1)(C) (2013), to individuals performing a discretionary function on behalf of the State. Alternatively, Kemmerer argues that he is entitled to common law qualified immunity against Clifford's MCRA claims. Kemmerer also asks us to conclude that he is entitled to judgment on Clifford's MCRA claims as a matter of law because he did not engage in or threaten "physical force or violence" and therefore cannot be liable under the MCRA.

---

[2] Title 5 M.R.S. § 4682(1-A) (2013) states:

Whenever any person, whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat of physical force or violence against a person, damage or destruction of property or trespass on property with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State or violates section 4684-B, the person whose exercise or enjoyment of these rights has been interfered with, or attempted to be interfered with, may institute and prosecute in that person's own name and on that person's own behalf a civil action for legal or equitable relief.

[¶4] Clifford contends that Kemmerer is not entitled to absolute immunity against her MCRA claims and that the remainder of his appeal should be dismissed because it is interlocutory and because factual disputes preclude resolution of the remaining issues.

[¶5] Additionally, the Superior Court reported to us, pursuant to M.R. App. P. 24(c), two questions of law: (1) "Whether the conduct found by [the] court to have been committed by [Kemmerer] is actionable under the [Maine] Human Rights Act" (MHRA), *see* 5 M.R.S. §§ 4551-4634 (2007),[3] and (2) "Whether [MaineGeneral] may be held liable under the [MCRA] on the theory of *respondeat superior* for the wrongful acts of its employees."

[¶6] We reach the merits of Kemmerer's appeal on the immunity issues and affirm the trial court's order denying summary judgment, but we do not reach Kemmerer's remaining arguments in this interlocutory appeal. We decline to reach the issues raised by the trial court's report.

## I. THE EMERGENCY ADMISSION LAWS

[¶7] The terms of the emergency admission laws,[4] also called the "blue paper" process or, albeit imprecisely, "involuntary commitment" laws, in effect in

---

[3] Portions of the MHRA have been amended since the operative events in this case occurred, and we therefore cite the 2007 volume of the statutes.

[4] Although the procedures set forth for involuntarily hospitalizing a person on an emergency basis for mental health purposes have become known as "involuntary commitment," and we use that phrase here at

2007, when the events in this case occurred, are important to an understanding of the issues before us. A law enforcement officer's authority to take an individual into protective custody to be transported for a mental health examination was established by 34-B M.R.S. § 3862 (2007),[5] which stated in pertinent part:

> **1**. **Law enforcement officer's power.** If a law enforcement officer has reasonable grounds to believe, based upon probable cause, that a person may be mentally ill and that due to that condition the person presents a threat of imminent and substantial physical harm to that person or to other persons, . . . the law enforcement officer:
>
> **A.** May take the person into protective custody; and
>
> **B.** If the law enforcement officer does take the person into protective custody, shall deliver the person immediately for examination as provided in section 3863 . . . . The examination may be performed by a licensed physician, a licensed clinical psychologist, a physician's assistant, a nurse practitioner or a certified psychiatric clinical nurse specialist.
>
> When, in formulating probable cause, the law enforcement officer relies upon information provided by a 3rd-party informant, the officer shall confirm that the informant has reason to believe, based upon the informant's recent personal observations of or conversations with a person, that the person may be mentally ill and that due to that condition the person presents a threat of imminent and substantial physical harm to that person or to other persons.

---

times, admission to a psychiatric hospital pursuant to the emergency procedures at issue here is distinct from commitment to a psychiatric hospital, as clarified by the Legislature by P.L. 2011, ch. 541, § 2 (effective Aug. 30, 2012) (codified at 34-B M.R.S. § 3863(9) (2013)).

[5] After the September 2007 events at issue in this appeal, 34-B M.R.S. § 3862 was amended by P.L. 2009, ch. 651, §§ 11, 12 (emergency legislation effective April 14, 2010).

**2**. **Certificate not executed.**  If a certificate relating to the person's likelihood of serious harm is not executed by the examiner under section 3863, . . .  the officer shall:

> **A.** Release the person from protective custody and, with the person's permission, return the person forthwith to the person's place of residence, if within the territorial jurisdiction of the officer;
>
> **B.** Release the person from protective custody and, with the person's permission, return the person forthwith to the place where the person was taken into protective custody; or
>
> **C.** If the person is also under arrest for a violation of law, retain the person in custody until the person is released in accordance with the law.

**3**. **Certificate executed.**  If the certificate is executed by the examiner under section 3863, the officer shall undertake forthwith to secure the endorsement of a judicial officer under section 3863 and may detain the person for a reasonable period of time, not to exceed 18 hours, pending that endorsement.

[¶8]  The emergency admission law applicable in 2007 regarding the mental examinations to be conducted after a person was taken into custody, 34-B M.R.S. § 3863 (2007),[6] stated, in pertinent part:

> A person may be admitted to a psychiatric hospital on an emergency basis according to the following procedures.
>
> **1. Application.** Any health officer, law enforcement officer or other person may make a written application to admit a person to a psychiatric hospital, subject to the prohibitions and penalties of section 3805, stating:

---

[6]  Title 34-B M.R.S. § 3863 was amended by P.L. 2009, ch. 276, § 1 (effective Sept. 12, 2009); P.L. 2009, ch. 451, § 10 (effective Sept. 12, 2009); P.L. 2009, ch. 651, §§ 13-19 (emergency legislation effective April 14, 2010); and P.L. 2011, ch. 541, § 2 (effective Aug. 30, 2012).

**A.** The person's belief that the person is mentally ill and, because of the person's illness, poses a likelihood of serious harm; and

**B.** The grounds for this belief.

**2. Certifying examination.** The written application must be accompanied by a dated certificate, signed by a licensed physician, physician's assistant, certified psychiatric clinical nurse specialist, nurse practitioner or [psychologist, indicating that]

**A.** The physician, physician's assistant, certified psychiatric clinical nurse specialist, nurse practitioner or psychologist has examined the person on the date of the certificate; and

**B.** The physician, physician's assistant, certified psychiatric clinical nurse specialist, nurse practitioner or psychologist is of the opinion that the person is mentally ill and, because of that illness, poses a likelihood of serious harm. The written certificate must include a description of the grounds for that opinion.

**2-A. Custody Agreement.** A . . . law enforcement agency may meet with representatives of those public and private health practitioners and health care facilities that are willing and qualified to perform the certifying examination required by this section in order to attempt to work out a procedure for the custody of the person who is to be examined while that person is waiting for that examination. Any agreement must be written and signed by and filed with all participating parties. In the event of failure to work out an agreement that is satisfactory to all participating parties, the procedures of section 3862 and [section 3863] continue to apply.

As part of an agreement the law enforcement officer requesting certification may transfer protective custody of the person for whom the certification is requested to . . . a health officer if that officer agrees . . . .

**3. Judicial review.** The application and accompanying certificate must be reviewed by a [specified judicial officer] . . . .

**A.** If the judge or justice finds the application and accompanying certificate to be regular and in accordance with the law, the judge or justice shall endorse them and promptly send them to the admitting psychiatric hospital. . . . .

**B.** A person may not be held against the person's will in a hospital under this section, except that a person for whom an examiner has executed the certificate under subsection 2 may be detained in a hospital for a reasonable period of time, not to exceed 24 hours, pending endorsement by a judge or justice, if:
. . . .

**(2)** For a person sought to be involuntarily admitted under this section, the person or persons seeking the involuntary admission undertake to secure the endorsement immediately upon execution of the certificate by the examiner.
. . . .

[¶9]  Thus, pursuant to then-existing law, a law enforcement officer could take an individual into protective custody if there was probable cause to believe that the person was then mentally ill and, as a result, posed a threat of imminent and substantial harm to herself or others, but if the officer relied on information from a third party to establish probable cause, the officer was required to confirm that the third party's assessment was based on "recent personal observations or conversations with" the person. The officer was then required to immediately deliver the person for a psychological examination pursuant to section 3863.

[¶10]  The person could be involuntarily admitted to a psychiatric hospital on an emergency basis only upon application, which could be made by any person,

8

and after an examination and issuance of a certificate that the person, because of his or her mental illness, posed a likelihood of serious harm. The only persons authorized by law to issue such a certificate, after examination of the individual, were a physician, physician's assistant, certified psychiatric clinical nurse specialist, nurse practitioner, or psychologist. Unless a certificate was executed, a hospital had no authority to detain an individual. If no certificate was executed, the person in law enforcement custody was to be released from protective custody and returned home or to another place designated in section 3862(2).

[¶11] If a certificate was executed, the person could be held in the protective custody of law enforcement for no more than eighteen hours or, if protective custody was transferred to a hospital, held involuntarily in a hospital for no more than twenty-four hours, pending judicial endorsement of the application and certificate. The statute provided no authority for administrators of a hospital or a social service agency to overrule the opinion of the professional examiner and order continued detention of an individual despite the professional examiner's opinion, following an appropriate examination, that emergency hospitalization was unnecessary.

[¶12] The third relevant law, 34-B M.R.S. § 3805 (2013), states that a person who willfully causes an unwarranted hospitalization of any person or

willfully causes the denial of any rights accorded to any person pursuant to the emergency admission and hospitalization laws is guilty of a Class C felony.[7]

## II. CASE HISTORY

[¶13]   Unless otherwise noted, the following reflects the facts in the summary judgment record viewed in the light most favorable to Clifford as the nonmoving party and, to the extent that facts are disputed, reflects her version of the facts.  *See Rodriguez v. Town of Moose River*, 2007 ME 68, ¶ 16, 922 A.2d 484; *Pinkham v. Rite Aid of Maine, Inc.*, 2006 ME 9, ¶ 6, 889 A.2d 1009.

[¶14]   Linda Clifford has a confirmed diagnosis of complex post-traumatic stress disorder (PTSD) resulting from abuse she experienced as a child.  Her PTSD constitutes a "disability" as defined by the MHRA, 5 M.R.S. § 4553-A(1)(A) (2013).  On September 25, 2007, Clifford, frustrated with then-proposed budget cuts to mental health services, sent the Governor a series of emails that were interpreted as threatening.  Shortly thereafter, two Maine State Police troopers entered Clifford's home, searched her home and her person for guns and contraband, took her into custody, and delivered her to MaineGeneral for a psychiatric evaluation.

---

[7]  The term "willfully" is not defined in the involuntary commitment statutes, but pursuant to the criminal code, that state of mind is satisfied if the person acts intentionally or knowingly.  17-A M.R.S. §§ 34(1), 35 (2013).

[¶15]  Amy Gordon, an employee of The Crisis and Counseling Center (C & C), conducted an initial interview of Clifford when she arrived at MaineGeneral's emergency department.  Gordon was not a person qualified to issue a certificate to support an emergency admission pursuant to 34-B M.R.S. § 3863.  C & C served as a "consultant" to emergency medical staff at MaineGeneral, interviewing patients and communicating with treating mental health providers.  After interviewing patients, C & C personnel would recommend to emergency department staff the appropriateness of psychiatric hospitalization for patients who had presented in psychiatric crisis.  The decision whether to commit or discharge a patient was described, perhaps as a matter of hospital policy but not in the law, as a collaborative action between the emergency room physician and C & C, with the physician giving the recommendation of C & C considerable weight.  However, the emergency department physician had "the last word" on whether a person met the criteria for involuntary emergency admission, as required by 34-B M.R.S. § 3863(2).

[¶16]  In her written report of her interview with Clifford, Gordon noted that Clifford had been the victim of abuse as a child, suffered from serious mental health issues, had previously been hospitalized at the Riverview Psychiatric Hospital, and was a current client of the Sweetser Agency, a provider of mental health services.  The MaineGeneral triage nurse also noted in computerized

hospital records that Clifford suffered from psychological problems including PTSD.

[¶17] Dr. Harry Grimmnitz, an emergency room physician at MaineGeneral, then conducted the statutorily required examination of Clifford. He also spoke with the troopers who brought Clifford to the hospital. Grimmnitz learned that the troopers had concluded that Clifford did not pose a threat to anyone and did not intend to press charges against Clifford.

[¶18] After completing his examination, Grimmnitz concluded that Clifford did not pose any risk of harm to herself or others and that she did not meet the criteria for involuntary commitment. Gordon, the C & C representative, agreed with Grimmnitz's independent assessment that Clifford did not require hospitalization or crisis stabilization and should be discharged. Accordingly, as required by 34-B M.R.S. § 3862(2), Grimmnitz discharged Clifford in Gordon's presence at 6:15 p.m. Clifford left the hospital and went home.

[¶19] Subsequently, Gordon's superiors at C & C, who had not examined Clifford, reviewed Clifford's emails to the Governor and, based on the emails alone, determined that Clifford should undergo another evaluation to determine whether she posed a threat of harm. Gordon's supervisor directed Gordon to call the State Police and ask that Clifford be taken into custody and returned to the hospital for a second psychiatric evaluation, which Gordon reluctantly did.

12

Contrary to evidence indicating that the supervisor directed Gordon to ask law enforcement to return Clifford to the hospital for further evaluation, the supervisor asserted that she believed that the State Police would independently determine whether conditions existed to justify placing Clifford in protective custody and returning her to the hospital.

[¶20] When a trooper arrived at Clifford's home on the evening of September 25, the trooper made no attempt to assess whether Clifford was mentally ill or posed a threat of harm, believing that someone else had already determined her need for psychiatric evaluation. To effectuate C & C's request that Clifford be returned to the hospital, the trooper tried to persuade Clifford to come with him by falsely informing her that her discharge papers had not been signed. Initially, Clifford refused to comply, but she gave in when the trooper told her that he could take her to the hospital "the easy way or the hard way." The trooper dropped Clifford off at MaineGeneral at approximately 8:30 p.m. Clifford remained in the protective custody of law enforcement, pending examination, because no custody agreement with the hospital was effected.

[¶21] When Clifford arrived at the hospital for the second time, Gordon approached her in the lobby, apologized to her, and told her that a mistake had been made. Clifford was told by emergency room staff that she would not be permitted to leave the hospital, although no one told her why she had been returned

to the hospital or why she could not go home. Clifford waited in the hospital lobby for well over an hour.

[¶22] While Clifford was waiting, Grimmnitz—who was then off duty and was "on his way out the door" when Clifford was returned to MaineGeneral—advised Dr. Scott Kemmerer, the director of emergency medicine at MaineGeneral, that (i) he had conducted an involuntary commitment evaluation of Clifford earlier that day; (ii) in his professional opinion, Clifford did not pose a risk of harm to herself or others and that his opinion had not changed; (iii) Gordon, who had interviewed Clifford, agreed with him; and (iv) a C & C supervisor had made the decision to have Clifford returned to the hospital for further psychiatric evaluation. Gordon informed Kemmerer about the emails that Clifford had sent to the Governor, and Kemmerer knew that the decision to return Clifford to the hospital was made by persons at C & C who had not interviewed Clifford, and was based solely on Clifford's emails.

[¶23] Kemmerer admitted that he had "no idea what [C&C] knew and why they decided" that Clifford had to be returned to the hospital but that one has to "take that seriously" "when there is alleged threats against the governor." Thus, viewing the record in a light most favorable to Clifford, Kemmerer was aware that no new information regarding Clifford's mental health had developed since she had been examined by Grimmnitz, who had determined that she did not meet the

14

criteria for issuing a certificate authorizing emergency commitment and had discharged her to return home as required by 34-B M.R.S. § 3862(2).

[¶24] Kemmerer also was aware from his conversation with Grimmnitz that Clifford had a history of psychiatric disorder, but he did not know that Clifford suffered from PTSD, what caused it, or what might trigger its symptoms. However, he did have access to the record prepared by the triage nurse who had interviewed Clifford when she first arrived at the hospital, which stated that Clifford suffered from PTSD. Kemmerer also was aware that C & C, despite having no new information about Clifford's condition, wanted to initiate a second emergency commitment process pursuant to 34-B M.R.S. § 3863, and that, if that occurred, Clifford would likely not be evaluated by a psychiatrist until the following day.

[¶25] On the record before us, it is unclear why Clifford would have had to wait for an evaluation by a psychiatrist. Kemmerer asserts that it probably would have required "that level of authority" to discharge Clifford. Kemmerer also claims that, as a factual matter, if he had examined Clifford and determined that a certificate should not be executed, and C & C disagreed, the final decision would be referred to a psychiatrist as a "tie breaker." However, the emergency admission statute provided no legal basis for any of these factual assertions. The law authorized Kemmerer, as a physician, to perform the evaluation, and it provided no

authority for C & C to issue a second opinion that would then require reference to a psychiatrist to make the final commitment decision. *See* 34-B M.R.S. § 3863.

[¶26] Clifford was seen at approximately 10:00 p.m. by a triage nurse, and at 10:15 p.m. by Kemmerer in an examining room in the emergency department. Kemmerer did not perceive Clifford to be psychiatrically stable when he first examined her, but he was not prepared to certify that Clifford was mentally ill and posed a threat of harm sufficient to support signing emergency admission papers. Nonetheless, he told Clifford, without explaining why, that she was not going to be allowed to leave the hospital.

[¶27] Clifford contends that, at some point, she was told by a hospital or C & C worker, in Kemmerer's presence, that her only "choice" was to consent "voluntarily" to stay in the hospital with the prospect of release in twenty-four hours or to be "blue-papered" and remain at MaineGeneral involuntarily for seventy-two hours while the emergency admission process took place.[8] The worker advised Clifford to take "the 24."

---

[8] Although in a portion not specifically cited by the parties, the summary judgment record indicates that Clifford testified that the worker "had the 24 to 72-hour paper. She said, if I was you, I'd take the latter of the two and 24. You've been blue-papered for the 72 hours—I think it was 72 hours. And I said, that's the choice I have? And she goes, yes." We have indicated that we will consider evidence "not identified in statements of material fact when, having become aware of such evidence, it would be an injustice to ignore it." *HSBC Mortg. Servs., Inc. v. Murphy*, 2011 ME 59, ¶ 16 n.9, 19 A.3d 815.

Even if the worker did not explicitly tell Clifford that she would be detained for seventy-two hours if Clifford failed to consent to admission, the worker and Kemmerer did not correct Clifford's

16

[¶28] Kemmerer apparently agreed with the worker's advice. He states that he told Clifford that C & C wanted her blue-papered but that she could avoid this by admitting herself voluntarily overnight. No one informed Clifford that she had a right to refuse to sign the form consenting to hospital admission because the blue paper emergency hospitalization process had not been initiated.

[¶29] In many circumstances, it may be good practice for examining professionals, engaging in a statutorily authorized emergency commitment process, to suggest to individuals who are being examined that they have an option of voluntary hospitalization or other, less stigmatizing alternatives to completion of the emergency commitment process. Here, however, the facts, construed most favorably to Clifford, particularly the alleged reference to potentially lengthy detention before initiation and completion of the commitment process, suggest that the references to voluntary commitment were part of a broader effort, in violation of the emergency commitment law, to pressure Clifford to relinquish her fundamental rights. [9]

---

understanding that her choice was to voluntarily admit herself for twenty-four hours or be detained for seventy-two hours while the blue paper process proceeded.

[9] By statute, the blue paper process for a person detained by a law enforcement officer must be completed within eighteen hours or, for a person detained in a hospital on an emergency basis, within twenty-four hours, after the certificate is executed, 34-B M.R.S. §§ 3862(3), 3863(3)(B) (2007), though it is certainly the intent of the law that the evaluation that would determine whether a certificate is executed would occur promptly, which was not occurring when Clifford was forced to return to the hospital for the second time.

[¶30]  After Kemmerer left the examining room, Clifford noticed a hospital security guard sitting in the hallway outside the door to her room.  Upset that she was apparently not going home, even though she had previously been evaluated and discharged, Clifford closed the door and began to cry.  Almost immediately, a staff person opened the door and angrily informed her that the door of the examining room must remain open.  Clifford then began to yell and complain that she wanted to go home.  Kemmerer returned to the examining room, and angrily said, "You are not listening to me.  You are not leaving."  Clifford became agitated and verbally abusive to Kemmerer when, without explaining why, he told her that she could not leave the hospital.

[¶31]  Clifford reluctantly signed the consent form, which stated only that she consented to medical treatment at MaineGeneral and had the right to object to treatment.  Construed most favorably to Clifford, the record would support a finding that she signed the consent form only after Kemmerer told her that she would not be leaving that hospital and after she was informed, falsely, that she could be held without her consent for up to seventy-two hours while the second blue paper process, which was not yet initiated, could be completed.[10]  When

---

[10]  A written policy of the hospital, describing the procedures and criteria for "detaining patients pending blue papers," consistent with the emergency admission statute, stated that a patient could not be detained pending judicial endorsement unless parts one (requiring the initial application) and two (requiring the examiner's certification) of the blue paper process had been completed and judicial endorsement was "actively being sought," in which event the person could be detained for no more than

18

Clifford signed the consent form, no application had been filed seeking her admission to the hospital and there existed no doctor's certificate that she was mentally ill or posed a threat of harm.

[¶32]    After Clifford signed the form, and although Clifford explained that she had already been searched by the police, Kemmerer directed her to remove her clothes so that she could be searched for contraband and change into a hospital gown.   Clifford became extremely agitated and refused to take off her clothes. Kemmerer then called two male security guards into the examining room "to assist in enforcing his request," and Clifford was again instructed to remove her clothes. Clifford again refused, but when Kemmerer and the guards did not relent, she angrily pulled down her pants and underwear to demonstrate that she was not carrying any contraband.

[¶33]    MaineGeneral's written policy provided that hospital staff will generally search a patient's person and belongings only upon reasonable cause to believe that the person possessed prohibited items with "every effort . . . to assure that the search is conducted with respect and sensitivity to the patient's privacy and dignity."   The policy further stated that, with respect to the hospital's behavioral units, hospital staff could perform "upon admission" "a complete search" of the

---

eighteen hours when the evaluation was completed before 11:00 p.m.  Kemmerer was aware of these policies.

patient's belongings, but could only perform a "body search" pursuant to a doctor's order and when there was "documented reasonable cause to believe the patient has prohibited items on his or her person." A body search was to be conducted by two staff members, at least one of whom was the same gender as the patient, with "respect for the patient's dignity and privacy."[11]

[¶34] After the search, Clifford was taken to the psychiatric unit still wearing her street clothes. In the psychiatric unit, Clifford became increasingly angry and agitated. In response to her expressions of anger and frustration, she was taken by hospital staff to a locked, windowless room with a padded wall. In a moment of frustration, Clifford punched the padded wall and injured her hand and wrist. The following morning, Clifford was evaluated by a hospital psychiatrist who, like Grimmnitz the previous day, concluded that she did not pose a threat of harm to herself or others and recommended that she be discharged from the hospital. Thus, a day after she had been discharged the first time, Clifford was again discharged and allowed to go home.

---

[11] Kemmerer did not properly deny Clifford's statement of material fact asserting that the hospital's body search policy was violated when Clifford was searched without documented reasonable cause and without the presence of at least one female staff member. We note that the hospital policy's definition of "body search" does not include a "strip search," although the record does not include another hospital policy that apparently defines "strip search." We can only assume that a more intrusive body search than that described in the policy that is in the record would require procedural safeguards at least equal to, if not greater than, those described in the hospital policy before us.

### III.  CASE HISTORY SUMMARIZED

[¶35]  In summary, Clifford had been taken into custody and delivered to MaineGeneral for evaluation on September 25, 2007, where she was promptly evaluated and discharged by an emergency room physician, with the agreement of the evaluating C & C worker, after the physician determined that Clifford posed no threat of harm to herself or others.  Despite this, C & C supervisors, who had never seen Clifford, directed that she be returned to the hospital for further evaluation, even though there was no new information to support that directive.  Kemmerer was aware of these facts.

[¶36]  Kemmerer did not perform a full evaluation of Clifford when she returned to the hospital, but instead stood by, even facilitated, as Clifford was given a Hobson's choice of "voluntarily" consenting to admission to the hospital for twenty-four hours rather than, as she understood it, detention at the hospital for seventy-two hours pending a blue paper process that had not yet begun.  Kemmerer instructed Clifford to remove her clothes to allow a search for contraband, and when she refused, he—in violation of MaineGeneral policy—called in two male security guards to assist, and all three men watched as Clifford pulled down her pants and underwear.

[¶37]  Clifford was then held against her will for the night in a locked room in the psychiatric unit.  When a psychiatrist finally evaluated her the following day,

he, like Grimmnitz before him, concluded that Clifford posed no threat and discharged her.

## IV. PROCEDURAL HISTORY

[¶38]   Clifford commenced an action against MaineGeneral by filing a notice of claim before a prelitigation screening panel pursuant to the Maine Health Security Act (MHSA), 24 M.R.S. §§ 2853, 2903 (2013).   After some discovery, the parties waived further proceedings before that panel.

[¶39]   On September 28, 2009, Clifford filed a complaint against MaineGeneral in the Superior Court.   After filing a first amended complaint, Clifford was granted leave to file a second amended complaint to add claims against Kemmerer.   In the second amended complaint, Clifford asserted claims against MaineGeneral for professional negligence, alleged that MaineGeneral and Kemmerer violated the MCRA by depriving her of liberty without due process in violation of constitutional and statutory rights and subjecting her to an unreasonable search in violation of her constitutional rights, and asserted that MaineGeneral and Kemmerer had failed to accommodate Clifford's disability in violation of the MHRA.[12]

---

[12]   Clifford had previously alleged other claims against MaineGeneral and Kemmerer and claims against Grimmnitz that have since been abandoned or dismissed and that are not at issue here.

[¶40]   On January 31, 2011, Kemmerer and MaineGeneral jointly moved for dismissal and entry of summary judgment with respect to the MCRA and MHRA claims asserted against them.  While the motion was pending, the court stayed the action to allow the claims against Kemmerer to be presented to a prelitigation screening panel, pursuant to the MHSA.  After the screening panel had issued its decison, the court heard argument on the motion.

[¶41]   On January 14, 2013, the court granted in part and denied in part Kemmerer's and MaineGeneral's joint motion.  The court granted the motion as to MaineGeneral only on the MCRA claim asserted against it, determining that MaineGeneral may not, as a matter of law, be held vicariously liable for the acts of its employees under the MCRA.  In all other respects, the court denied the motion.

[¶42]   As to Kemmerer specifically, the court denied summary judgment, determining that (1) Kemmerer is not entitled to absolute immunity from Clifford's MCRA claims pursuant to the immunity provisions of the MTCA, concluding that discretionary function immunity does not extend to actions that "clearly exceed the scope" of the official's authority and that the summary judgment record demonstrates that Kemmerer's actions exceeded the scope of his authority;[13] (2) whether Kemmerer is entitled to common law qualified immunity

---

[13]   The trial court, citing *Doe v. Graham*, 2009 ME 88, 977 A.2d 391, distinguished opinions applying absolute immunity to complaints alleging negligence and other common law tort actions in involuntary commitment processes by observing that Clifford's claims alleged "that rather than complying with the

from Clifford's MCRA claims is a question for the fact-finder; (3) issues of material fact remain as to whether Kemmerer acted in violation of the MCRA, including whether he threatened Clifford with physical force or violence;[14] and (4) based on the summary judgment record, Kemmerer's conduct is actionable pursuant to the MHRA and issues of material fact preclude entry of summary judgment.

[¶43] Kemmerer then filed notice of this interlocutory appeal. Kemmerer also moved for an interlocutory report pursuant to M.R. App. P. 24(c), asking whether the conduct in which he was alleged to have engaged is actionable under the MHRA. The Superior Court granted the report on May 13, 2013. Although there is no indication that any party sought a report of the second question, the Superior Court then reported two questions of law to this Court pursuant to Rule 24(c): (1) "Whether the conduct found by [the] court to have been committed by [Kemmerer] is actionable under the [Maine] Human Rights Act," and (2) "Whether

---

blue paper process, [the defendants] threatened the blue paper process by making it clear that she would not be released by the hospital and demanded a voluntary commitment," and that "there was no statutorily mandated diagnosis necessary to determine if involuntary commitment was warranted."

[14] Specifically, the court determined that it "expect[ed] . . . there was a likelihood of the use of force" and that "one cannot surmise that physical force would not have been expected should [Clifford] not comply" with Kemmerer's instructions that she was staying at the hospital and that she disrobe.

24

[MaineGeneral] may be held liable under the [MCRA] on the theory of *respondeat superior* for the wrongful acts of its employees."[15]

## V. LEGAL ANALYSIS

### A. The Immunity Exception to the Final Judgment Rule

[¶44]  We generally review "only final judgments and not interlocutory orders, absent an exception to the final judgment rule." *Dep't of Agric. v. Ouellette*, 2007 ME 117, ¶ 7, 930 A.2d 1037.  Determination of the availability of absolute immunity under the MTCA or common law qualified immunity to shield Kemmerer from Clifford's MCRA claims involves questions of law and, pursuant to the death knell exception to the final judgment rule, is appropriate for review on interlocutory appeal.  *See Francis v. Dana-Cummings*, 2005 ME 36, ¶ 4 n.2, 868 A.2d 196; *Webb v. Haas*, 1999 ME 74, ¶ 5, 728 A.2d 1261.

### B. Absolute Immunity

[¶45]  Kemmerer contends that he acted as a governmental employee performing a discretionary function on behalf of the State within the meaning of the MTCA and is thus entitled to absolute immunity from Clifford's MCRA claims by virtue of the MTCA, 14 M.R.S. § 8111(1)(C).  Pointing to what he characterizes

---

[15]  Clifford filed a notice of cross-appeal in which she presented the issue of whether the Superior Court correctly concluded that MaineGeneral was not liable under the MCRA on a theory of respondeat superior, but Clifford has expressly declined to pursue that issue on appeal on the grounds that it lacks finality pursuant to M.R. Civ. P. 54(b)(1).  Accordingly, MaineGeneral has not participated in this interlocutory appeal.

as the "exceedingly broad" language of section 8111(1)(C), which states that governmental employees are "absolutely immune from personal civil liability" for performing discretionary functions, Kemmerer argues that section 8111(1) affords immunity from claims arising both in common law tort and statutory causes of action. Kemmerer also contends that, because the MCRA is silent on the subject of immunity, it must be presumed that public officials "retain the immunity for discretionary acts afforded them *both* by the common law *and* by the [MTCA]."

[¶46] The MCRA, 5 M.R.S. §§ 4681-4685 (2013), does not address the issue of immunity. We have determined that qualified immunity is available to governmental employees or actors for claims brought pursuant to the MCRA. *See Jenness v. Nickerson*, 637 A.2d 1152, 1154, 1159 (Me. 1994). However, because whether a governmental actor is entitled to absolute discretionary function immunity pursuant to section 8111(1) of the MTCA against claims brought pursuant to the MCRA is a question of law, we review de novo the court's determination of that question. *Liberty Ins. Underwriters, Inc. v. Estate of Faulkner*, 2008 ME 149, ¶ 15, 957 A.2d 94; *see generally McLain v. Milligan*, 847 F. Supp. 970, 974 n.5 (D. Me. 1994) (noting that Maine courts had not addressed whether the MCRA effectively waives immunity granted to governmental entities and employees under the MTCA).

[¶47] The MTCA affords governmental employees absolute immunity "from personal civil liability" for, among other things, performing or failing to perform discretionary functions within the scope of employment. 14 M.R.S. § 8111(1).[16] This shield extends to private, "non-state" physicians who participate in the emergency admission or involuntary commitment evaluation process. *See Doe v. Graham*, 2009 ME 88, ¶¶ 14-17, 977 A.2d 391; *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 12, 845 A.2d 1178; *Clark v. Me. Med. Ctr.*, 559 A.2d 358, 360 (Me. 1989); *Taylor v. Herst*, 537 A.2d 1163, 1165 (Me. 1988). Each of these prior precedents established that the absolute immunity protections of the MTCA are applicable to protect hospital staff from claims of negligent or careless conduct and

---

[16] Title 14 M.R.S. § 8111(1) (2013) provides in relevant part:

> **1. Immunity.** Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:
>
> . . . .
>
> **C.** Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid[.]
>
> . . . .
>
> The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees, including police officers and governmental employees involved in child welfare cases, who are required to exercise judgment or discretion in performing their official duties.

other common law tort claims in the emergency admission or involuntary commitment process.

[¶48]  Here, as the trial court observed, the MCRA claim is based not on an allegation of negligence or carelessness, but on facts suggesting violation of and disregard for the statutory mandates and due process and Fourth Amendment protections relating to the emergency admission or involuntary commitment process.  The question for us then becomes whether section 8111(1) provides absolute immunity from MCRA claims that assert a violation of and disregard for statutory mandates and due process and Fourth Amendment protections when, as here, the emergency commitment process had once been properly initiated and completed, Clifford had been discharged to return home, and then, based on no new information, and without a new commitment process having been formally initiated, Clifford was again ordered into custody, searched, and held overnight before being examined and again discharged the next morning.

[¶49]  We must strictly construe the MTCA because it was enacted in derogation of common law. *Beaulieu v. Aube Corp.*, 2002 ME 79, ¶ 19, 796 A.2d 683.  We have previously construed the notice requirement of the MTCA, as applied to a governmental entity, to apply "only to actions arising in tort" against the entity.  *Mueller v. Penobscot Valley Hosp.*, 538 A.2d 294, 297-98 (Me. 1988).  We held that the MTCA, read as a whole, "was not intended to apply to causes of

action for breach of contract" or to "civil rights actions brought under 42 U.S.C. § 1983." *Id.* at 298. In so concluding, we expressly determined that claims of deprivation of liberty brought pursuant to the Federal Civil Rights Act, 42 U.S.C. § 1983 (1981), were not tort claims for purposes of the MTCA. *Id.* at 295-98 & n.4.

[¶50] We see no rational basis to treat a claim asserting a violation of and disregard for statutory mandates and due process and Fourth Amendment protections brought pursuant to the Maine Civil Rights Act any differently than we would treat such a claim brought pursuant to the Federal Civil Rights Act. *See Doe I v. Williams*, 2013 ME 24, ¶ 72, 61 A.3d 718 (stating that the MCRA is patterned after section 1983). *See generally Leach v. Betters*, 599 A.2d 424, 426 (Me. 1991) (assuming without deciding that the MTCA's discretionary immunity provisions did not apply to shield defendant police officers from a claim alleging a violation of a statute that prohibited wanton and oppressive conduct in connection with making an arrest).

[¶51] While the absolute immunity provision of section 8111(1) of the MTCA would bar a claim against Dr. Kemmerer, even perhaps an MCRA claim, based on negligence or carelessness, it does not bar this particular MCRA claim alleging violation of and disregard for the statutory mandates and due process and Fourth Amendment protections relating to emergency admission and involuntary

commitment processes, when, as here, Clifford had been properly evaluated and discharged to return home, and then, based on no new information, and without a new commitment process having been formally initiated, Clifford was again ordered into custody, searched, and held overnight before being examined and again discharged the next morning.

C . Common Law Qualified Immunity

[¶52] Kemmerer contends that the Superior Court erred in denying him a summary judgment on the MCRA claims because he is entitled to qualified immunity, despite the court's determination that genuine issues of material fact remained to be resolved by the fact-finder on that issue. We review the denial of Kemmerer's motion for summary judgment based on qualified immunity "for errors of law, viewing the evidence in the light most favorable to the nonmoving party." *Rodriguez*, 2007 ME 68, ¶ 19, 922 A.2d 484; *see also Richards v. Town of Eliot*, 2001 ME 132, ¶ 24, 780 A.2d 281.

[¶53] Although the trial court determined that issues of material fact preclude a conclusion as to whether Kemmerer is entitled to common law qualified immunity against Clifford's MCRA claims, which would typically bar our addressing the issue on interlocutory appeal, *see Wilcox v. City of Portland*, 2009 ME 53, ¶¶ 13-14, 970 A.2d 295, Kemmerer has agreed that, for purposes of this appeal, Clifford's version of the facts apply when a dispute of facts exists. We

thus reach the issue of qualified immunity. *See Rodriguez*, 2007 ME 68, ¶ 16, 922 A.2d 484 ("Even when the trial court decides that there is a dispute of material fact regarding immunity, we will reach the merits of an appeal if the parties do not dispute the facts as alleged by the nonmoving party."); *see also Andrews v. Dep't of Envtl. Prot.*, 1998 ME 198, ¶ 5, 716 A.2d 212 (reaching the merits of whether the defendants were entitled to qualified immunity if a fact-finder accepted the plaintiff's version of the facts, noting that the defendant would otherwise lose his immunity from suit if we were to grant a plaintiff's motion to dismiss an interlocutory appeal).

[¶54]   The qualified immunity doctrine establishes that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Richards*, 2001 ME 132, ¶ 23, 780 A.2d 281 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Lyons v. City of Lewiston*, 666 A.2d 95, 99 (Me. 1995).[17]

---

[17]   Claims of qualified immunity raised under the MCRA are analyzed similarly to qualified immunity claims raised in federal civil rights actions. *See Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me. 1994); *see also Norton v. Hall*, 2003 ME 118, ¶¶ 17, 20 & n.3, 834 A.2d 928.  Additionally, the qualified immunity analysis pursuant to section 1983 discussed in *Richards v. Town of Eliot*, 2001 ME 132, ¶ 23, 780 A.2d 281, and *Lyons v. City of Lewiston*, 666 A.2d 95, 99 (Me. 1995), applies to the MCRA. *See Jenness*, 637 A.2d at 1154, 1159 (indicating our agreement that "the qualified immunity analysis under section 1983 also applies to the MCRA" and holding that, "[h]aving found [the defendant police officers] immune from the section 1983 claims, we also find them immune from claims under the

[¶55] "The two-part test for denial of qualified immunity is (1) whether the plaintiff's constitutional rights were violated, and (2) whether those rights were so clearly established that reasonable defendants would have known that their specific actions transgressed those rights." *Lyons*, 666 A.2d at 99; *see Webb*, 1999 ME 74, ¶ 8, 728 A.2d 1261 (stating that qualified immunity shields government officials from civil liability under section 1983 if their conduct does not violate clearly established statutory rights of which a reasonable person would have known).

### 1.    Due Process Claim and Violation of Statutory Rights

[¶56] Kemmerer contends that he did not deprive Clifford of constitutional or statutory due process by violating the statute's procedural safeguards because Clifford could have "taken her chances" with the emergency admission process, and her choice to consent to voluntary admission and consequent failure to undergo the emergency admission process does not make the process itself constitutionally inadequate. We first address whether, under the facts established

---

MCRA" and affirming summary judgment to the officers on the MCRA claims); *see also Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1373 n.3 (1st Cir. 1995) (citing *Jenness* for the proposition that the qualified immunity analysis applicable to federal civil rights claims applies to claims brought under the MCRA); *Jackson v. Town of Waldoboro*, 751 F. Supp. 2d 263, 275 (D. Me. 2010) (same).

We were not required to consider in *Jenness v. Nickerson* whether qualified immunity is available to non-governmental officials against whom claims are brought pursuant to the MCRA, nor do we address that issue here. *See* 637 A.2d at 1159. Neither party has raised the issue whether Kemmerer was a government official for purposes of the qualified immunity analysis under the MCRA or whether he is required to have been, and we need not consider that because we conclude that, regardless, Kemmerer is not entitled to a summary judgment based on qualified immunity against Clifford's MCRA claims.

in the summary judgment record, Kemmerer violated Clifford's due process rights, considering her statutory rights stated in 34-B M.R.S. § 3863, and whether those rights were so clearly established that a person in Kemmerer's position should have known that his actions violated those rights. *See Lyons*, 666 A.2d at 99.

[¶57]   Clifford's constitutional rights stem from the prohibition against deprivation of liberty without due process of law in the United States and Maine Constitutions.[18]  *See Graham*, 2009 ME 88, ¶ 22, 977 A.2d 391; U.S. Const. amend. XIV, § 1; Me. Const. art. I, § 6–A.  To prove a violation, Clifford must show that she was deprived of a liberty interest and that the process was inadequate.[19]  *See Botting v. Dep't of Behavioral & Dev'l. Servs*., 2003 ME 152, ¶ 23, 838 A.2d 1168.

---

[18]  To the extent that Clifford alleges a violation of due process rights protected under the Maine Constitution as well as that of the United States, we interpret the Maine provision coextensively with the due process rights provided by the Fourteenth Amendment.  *Doe I v. Williams*, 2013 ME 24, ¶ 61, 61 A.3d 718.

[19]  We have held that state action is also a prerequisite to maintaining a due process challenge, but have had no occasion to address whether that requirement applies in the context of the MCRA, which explicitly provides for a remedy against interference of rights by private persons.  *See Graham*, 2009 ME 88, ¶ 22 n.7, 977 A.2d 391 (declining to reach whether the defendant doctor in that action was a state actor for purposes of the MCRA); *cf. Phelps v. President & Trs. of Colby Coll.*, 595 A.2d 403, 405-08 (Me. 1991) (interpreting the predecessor version of the MCRA, 5 M.R.S.A. § 4682 (Supp. 1990)), as it existed prior to substantial amendments, as providing no remedy for alleged deprivation of First Amendment rights by a private party because a violation of First Amendment rights required state action).

We do not resolve this issue here. The parties did not address whether, and appear to implicitly agree that, at least for purposes of this appeal, Kemmerer's actions constituted state action for purposes of the MCRA.  We therefore assume that, if state action is required to bring a due process or other constitutional claim under the MCRA, Kemmerer was a state actor as he contended, citing *Doe v. Graham*, in arguing that he was entitled to absolute immunity pursuant to section 8111(1) of the MTCA.

[¶58] Involuntary commitment is a grave deprivation of a person's fundamental liberty. *See Zinermon v. Burch*, 494 U.S. 113, 131 (1990) (recognizing a "substantial liberty interest in avoiding confinement in a mental hospital"); *Green v. Comm'r of Mental Health & Mental Retardation*, 2000 ME 92, ¶ 14, 750 A.2d 1265 ("[I]ndividuals who are not mentally ill and who have not been found guilty of any crime have a fundamental interest in being free from indefinite confinement by the government . . . .").

[¶59] To determine whether a specific procedure satisfies due process, we balance three factors: (1) the private interest at stake; (2) the risk of error inherent in the procedure; and (3) the government interest in the procedure. *Graham*, 2009 ME 88, ¶ 23, 977 A.2d 391 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). As we discussed in *Graham*, the first and third factors are established here. *Id.* In *Graham*, we then addressed whether the involuntary commitment procedures were sufficient to "ensure that the risk of error in commitment determinations is low." *Id.* Although we were not ultimately required to decide whether the statutory involuntary commitment procedures satisfy due process, we concluded that "Maine's involuntary commitment scheme contains numerous procedural safeguards to protect against erroneous commitment decisions." *Id.* ¶¶ 24-25; *see* 34-B M.R.S. § 3863. Because the record here, construed most favorably to Clifford, shows that Kemmerer disregarded the procedures designed

to provide the necessary constitutional process, Kemmerer's conduct failed to ensure "that the risk of error" was low. *Graham*, 2009 ME 88, ¶ 23, 977 A.2d 391.

[¶60] Viewing the facts in the light most favorable to Clifford, Kemmerer did not evaluate Clifford's mental illness or find that she posed a likelihood of serious harm to herself or others, but he nonetheless directed that she not be allowed to leave the hospital, without explaining why. He did so even though he knew that (i) medical and mental health professionals, including Grimmnitz, had found earlier that day that Clifford was not likely to pose a risk of harm; (ii) the personnel at C & C who had directed Clifford's return to MaineGeneral had not evaluated her but had directed her return to the hospital based on the same information that had caused her to be brought to the hospital the first time; and (iii) no new application for Clifford's evaluation had been presented. His angry insistence that Clifford would not be allowed to leave the hospital was reinforced by the presence of security, the misinformation given to her about her "options," which Kemmerer did not correct, and his apparent support for Clifford's voluntarily committing herself over threats of a blue paper process that had not been initiated.

[¶61] Kemmerer's contention that Clifford was not due any process because she chose not to avail herself of the emergency admission procedure is unsupportable; Clifford did not freely give up her liberty or her right to process.

Under the first prong of the applicable qualified immunity test, the summary judgment record establishes that Kemmerer violated Clifford's due process rights, as well as her statutory rights pursuant to section 3863.[20]

[¶62]  Under the second prong of the test, we consider whether Clifford's constitutional and statutory rights were so clearly established that a reasonable person in Kemmerer's position would have known that his specific actions transgressed those rights.  *Lyons*, 666 A.2d at 99; *see also Richards*, 2001 ME 132, ¶ 25, 780 A.2d 281.  "Clearly established" means that "the unlawfulness of the act must be apparent in light of pre-existing law, not merely a general declaration of the legal right allegedly violated."  *Lyons*, 666 A.2d at 99; *see also Richards*, 2001 ME 132, ¶ 25, 780 A.2d 281 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

[¶63]  Maine law, 34-B M.R.S. § 3805, specifically states, as it did at the relevant time, that a person who willfully causes an unwarranted involuntary hospitalization of any person or willfully causes the denial of any rights accorded

---

[20]  We are unpersuaded by Kemmerer's argument that, pursuant to the *Parratt-Hudson* doctrine, Clifford's post-deprivation remedies afford her all the process she is due.  *See Zinermon v. Burch*, 494 U.S. 113, 128-30, 132, 136-39 (1990).  Despite Kemmerer's failure to comply with the involuntary commitment procedures of 34-B M.R.S. § 3863, his actions in ensuring that Clifford was held overnight for examination—which he could have performed himself—when there was no application for examination or any support for her return to the hospital and in creating a false "choice" for Clifford to voluntarily commit herself to avoid the blue paper process, were not unforeseeable to and unpreventable by the State.  *See Zinermon*, 494 U.S. at 128-30, 132, 136-39.

to any person pursuant to the emergency admission law is guilty of a Class C felony. However, an action's unlawfulness can be apparent even though the action has not been previously held unlawful. *Andrews*, 1998 ME 198, ¶ 12, 716 A.2d 212. What the law was and whether it was clearly established at the time of the alleged violation are questions of law. *Id.* ¶ 13.

[¶64] Kemmerer contends that the situation he confronted "was both extraordinarily unusual and difficult," and that the law was not clear as to what must happen if a person is presented to the hospital, as here, in violation of Maine's protective custody statute, 34-B M.R.S. § 3862. That C & C or another person may have violated Clifford's constitutional and statutory rights prior to her arrival at MaineGeneral does not release Kemmerer from liability. The involuntary commitment procedures were established at the time that Kemmerer deprived Clifford of her due process rights by restraining her liberty without regard to the statute's procedural safeguards, *see* 34-B M.R.S. §§ 3805, 3863. Kemmerer, as the director of emergency medicine at MaineGeneral, has acknowledged that he was familiar with those procedures; and courts have long recognized that a person has substantial liberty interests in "avoiding confinement in a mental hospital" and in "not being confined unnecessarily for medical treatment," *Zinermon*, 494 U.S. at 131; *see also Haley v. City of Boston*, 657 F.3d 39, 50-51 (1st Cir. 2011) (stating that the facts of previous cases need not be materially similar to the case at hand in

order to conclude that one is not entitled to qualified immunity, noting that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," even if the specific action in question has not previously been held unlawful (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))).

[¶65]  The record supports a conclusion that a reasonable person in Kemmerer's position would have known that, by informing Clifford that she was not leaving the hospital under any circumstances—even though she had been returned to the hospital based on no new information, there was no application seeking her admission to the hospital, and no evaluation had been performed although Kemmerer was authorized to perform one—and participating in or facilitating her "voluntary" admission upon threat of initiating a blue paper process that had not yet begun and probably would have failed, his conduct was objectively unreasonable and "transgressed" Clifford's statutory and due process rights. *See Lyons*, 666 A.2d at 99.  On this record, Kemmerer is not entitled to qualified immunity against Clifford's MCRA claim grounded in a violation of her right to due process or rights secured by 34-B M.R.S. §§ 3805 and 3863.

2.      Rights of Privacy and Freedom from Unreasonable Searches

[¶66]  Clifford also contends that Kemmerer violated her constitutional rights to privacy and freedom from an unreasonable search when, without having

38

reasonable grounds to believe that Clifford was in possession of contraband, he instructed her to remove her clothes so that she could be searched for contraband. Kemmerer contends that, on the undisputed facts, no search occurred and that, at most, there was only a "threat" of a search, which does not amount to a constitutional violation.

[¶67]  Again applying the two-part qualified immunity analysis, the first question is whether Clifford's constitutional rights were violated.[21]  "It is a piece of constitutional bedrock that individuals have a reasonable expectation of privacy regarding their bodies."  *Spencer v. Roche*, 659 F.3d 142, 146 (1st Cir. 2011).  "[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual."  *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996).  However, "[w]hether a constitutional violation exists for forcing a person to be viewed naked by members of the opposite sex depends on the reasonableness of the actions under the circumstances."  *Jenness*, 637 A.2d at 1157.  In *Bell v. Wolfish*, the United States Supreme Court described how a court must determine whether a particular search is reasonable:

---

[21]  Like due process claims, claims brought pursuant to the Fourth Amendment, applied to the states by virtue of the Fourteenth Amendment, apply to the actions of state agents.  *See New Jersey v. T.L.O.*, 469 U.S. 325, 334-35 (1985); *see also supra* n.19 for additional discussion.  To the extent that Clifford alleges a violation under the Maine Constitution, article 1, section 5, which contains language nearly identical to that of the Fourth Amendment, is interpreted coextensively with its federal counterpart.  *State v. Gulick*, 2000 ME 170, ¶ 9 n.3, 759 A.2d 1085.

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. 520, 559 (1979).

[¶68] Viewing the record in the light most favorable to Clifford, Kemmerer violated Clifford's constitutional right against unreasonable searches when, in violation of hospital policy requiring documentation of cause to believe she possessed prohibited items on her person, he directed her to remove her clothes and submit to a body search for contraband, and then, in further violation of hospital policy, called two male security guards to the examining room to enforce that directive after Clifford refused to comply. At the time of the search, there was no evidence to support a belief that Clifford carried contraband, there were no exigent circumstances that demanded that she be searched at all, much less in the presence of three men, and although Clifford had, under duress, consented to medical treatment, she was not legally committed under either the voluntary, *see* 34-B M.R.S. §§ 3831, 3832 (2007), or involuntary commitment procedures. Consequently, the search was devoid of any legitimate governmental justification and was not based on any reasonable suspicion that Clifford carried contraband, as

required by the law and the hospital's own body search policies. *See generally*

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370-71 (2009).

[¶69] Kemmerer's contention that his conduct was merely a "threat" of a

search and that Clifford removed her own clothes is unavailing. Clifford only

removed her clothes when Kemmerer, supported by two male security guards,

ordered her to do so, and it became clear that Kemmerer would not relent. *See*

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510,

1514-15 (2012) (stating that the term "strip search" is imprecise and can include an

"instruction to remove clothing while an officer observes from a distance of, say,

five feet or more" or "directing" individuals to run their fingers through their own

hair, to raise their arms, or expose their own body parts with no touching by the

official); *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 566-67, 572-74

(6th Cir. 2013) (concluding that a constitutional violation existed when, in 2007, a

prison guard instructed an inmate to remove her clothes and submit to a visual

search without a "legitimate penological interest" for that "*particular* search").

[¶70] As to whether Clifford's right to be free of a body search in this

situation was "clearly established," *Lyons*, 666 A.2d at 99, a person in Kemmerer's

position was on notice in September 2007 that such a search, absent reasonable

suspicion, would have violated Clifford's constitutional rights under the

circumstances presented in this record. Although jurisprudence in this area has

since evolved, *see Florence*, 132 S. Ct. 1510, case law prior to September 2007 had established that strip searches of individuals arrested for minor offenses were unconstitutional if not supported by a reasonable suspicion that the arrestees were hiding a weapon or contraband. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 621 F.3d 296, 304-05 & n.4 (3d Cir. 2010) (noting that, prior to 2008, ten circuit courts of appeals had held that searches of arrestees for minor offenses were unconstitutional when not supported by reasonable suspicion); *see also Roberts v. Rhode Island*, 239 F.3d 107, 113 (1st Cir. 2001) ("[A]n indiscriminate strip search policy routinely applied . . . can not be justified simply on the basis of administrative ease in attending to security considerations").

[¶71]    If law enforcement officers, pre-2008, violated the Fourth Amendment if they strip searched arrestees absent at least a reasonable suspicion of wrongdoing, then it would have been apparent to a reasonable person in Kemmerer's position that medical practitioners were not permitted to strip search patients, particularly a female patient with threatened assistance from male nonmedical staff, without cause. *Cf. Davis v. Rennie*, 264 F.3d 86, 114-15 (1st Cir. 2001) (concluding, in analyzing a qualified immunity defense, that cases establishing a particular duty, in that case a duty to intervene, on police and correctional officers, were sufficient to put mental hospital staff at a state institution on notice of "at least the same duty," noting that "involuntarily

committed patients are entitled to greater protection than those 'whose conditions of confinement are designed to punish'" (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)).

[¶72] MaineGeneral's body search policy in effect at the time, as included in the summary judgment record, required "reasonable cause" and consent to search the body of a patient and, with respect to patients in behavioral units who did not consent to a search, "documented reasonable cause to believe the patient has prohibited items on his or her person" before a physician could order a patient in the behavioral unit to be searched, and even then, the search had to be conducted by at least one staff member of the same gender as the patient. Kemmerer is not entitled to common law qualified immunity against Clifford's MCRA claim grounded in a violation of her rights to privacy and freedom from unreasonable searches.

[¶73] In sum, because (1) on the summary judgment record, there are at least disputes as to material fact as to whether Kemmerer deprived Clifford of liberty without due process of law and violated her statutory rights under section 3863, and violated her right to be free from unreasonable searches, and (2) a reasonable defendant would have understood that Kemmerer's conduct in each instance amounted to violations of clearly established constitutional or statutory

rights, Kemmerer is not entitled to qualified immunity from Clifford's MCRA claims.

D .    Remaining Issues

[¶74]  The Superior Court determined that genuine issues of material fact precluded the entry of summary judgment in Kemmerer's favor on the merits of Clifford's MCRA claims.  Kemmerer argues that we should address the merits of Clifford's MCRA claim because the issues involved are "inextricably tied" with the issues relating to immunity and, further, that we should conclude, contrary to the trial court's determination, that he is entitled to judgment as a matter of law on those claims.  Specifically, Kemmerer argues that his actions, as established in the summary judgment record, did not constitute a "threat of physical force or violence" within the meaning of the MCRA and therefore he cannot be held liable under the MCRA.[22]

[¶75]  Contrary to Kemmerer's contentions, whether or not he intentionally interfered or attempted to intentionally interfere with Clifford's constitutional rights by a "threat of physical force or violence" against her is not relevant to, and

---

[22]  To prevail on the MCRA claims, Clifford must prove, among other things, that Kemmerer used or threatened physical force or violence when he deprived her of a constitutional or statutory right.  5 M.R.S. §§ 4682(1-A), 4684 (2013); *see Bagley v. Raymond Sch. Dep't*, 1999 ME 60, ¶ 10 n.5, 728 A.2d 127 (affirming the grant of summary judgment to the defendants on the plaintiffs' MCRA claim, citing 5 M.R.S. § 4681 (Supp. 1998), solely on the basis that the plaintiffs did not present any claim of the use or threat of physical force or violence).

therefore is not inextricably tied to, the analysis relating to whether he is entitled to qualified immunity under the MCRA. Therefore, it would not serve judicial economy to address the merits of Clifford's MCRA claim on interlocutory appeal when, regardless, issues will remain for the trial court's consideration. *See Bank of New York v. Richardson*, 2011 ME 38, ¶¶ 7, 12, 15 A.3d 756. Pursuant to the final judgment rule, we do not reach this issue and, thus, do not disturb the motion court's determination that the summary judgment record precludes the entry of summary judgment in Kemmerer's favor on the merits of Clifford's MCRA claims. *See id.*; *Norton v. Town of Long Island*, 2003 ME 25, ¶ 6, 816 A.2d 59; *see also Limone v. Condon*, 372 F.3d 39, 50, 52 (1st Cir. 2004) (declining to consider non-immunity issues along with the immunity issue addressed in an interlocutory appeal, stating that "[f]ederal courts long have recognized that interlocutory review of a denial of qualified immunity does not in and of itself confer jurisdiction over other contested issues in the case"); *cf. Ryan v. City of Augusta*, 622 A.2d 74, 76-77 (Me. 1993).

[¶76]  Finally, we decline to accept the questions reported pursuant to M.R. App. P. 24(c).[23] *See Littlebrook Airpark Condo. Ass'n v. Sweet Peas, LLC,*

---

[23]  M.R. App. P. 24(c) provides:

> If the trial court is of the opinion that a question of law involved in an interlocutory order or ruling made by it ought to be determined by the Law Court before any further proceedings are taken, it may on motion of the aggrieved party report the case to the Law

2013 ME 89, ¶ 9, 81 A.3d 348 (discussing the factors we apply when independently deciding whether, in our discretion, to accept a report, which we do "sparingly").

The entry is:

> Judgment affirmed as to the denial of summary judgment on issues of immunity. As to the remaining issues, Kemmerer's appeal is dismissed as interlocutory. Report discharged. Remanded for further proceedings consistent with this opinion.

---

**On the briefs:**

Christopher C. Taintor, Esq., Norman, Hanson & DeTroy, LLC, Portland, for appellant Scott Kemmerer

Curtis Webber, Esq., and Patricia C. Shorey, Esq., Linnell, Choate & Webber, Auburn, for appellee Linda J. Clifford

Mark C. Joyce, Esq., Disability Rights Center of Maine, Augusta, for amicus curiae Disability Rights Center of Maine

---

Court for that purpose and stay all further proceedings except such as are necessary to preserve the rights of the parties without making any decision therein.

We note that it does not appear that the trial court's second reported question was initiated by any "motion of the aggrieved party," M.R. App. P. 24(c), or that all the parties, which would include MaineGeneral, agreed to the report of this question as required by M.R. App. P. 24(a) and (b). It therefore appears that the second reported question is not properly before us.

46

**At oral argument:**

Christopher C. Taintor, Esq., for appellant Scott Kemmerer

Curtis Webber, Esq. for appellee Linda J. Clifford