STATE OF MAINE                                  BUSINESS & COUNSUMER DOCKET
CUMBERLAND, ss.                                 DOCKET NO. BCD-CV-18-52

CORY GUIMOND, et al.,                 )
                                      )
        Plaintiffs,                   )
                                      )
        v.                            )       ORDER GRANTING DEFENDANTS'
                                      )       MOTION FOR SUMMARY JUDGMENT
CITY OF EASTPORT, et al.,             )
                                      )
        Defendants.                   )

This is a case about the scope and applicability of the immunity provided by the Maine Tort Claims Act. The underlying facts involve a commercial boatbuilder's decision to move its operations into a municipality-owned former mill building, and the problems that arose over the course of its tenancy in the building. The defendants—the City of Eastport ("Eastport," or the "City"), Elaine Abbott, Gilbert Murphy, Jan Finley, Mary Repole, Roscoe Archer, and Scott Emery (collectively, with the City, "Defendants")—have moved for summary judgment pursuant to M.R. Civ. P. 56(b) on all four counts of the Complaint filed by Plaintiffs Cory Guimond and Millennium Marine USA, Inc. ("MMUSA").[1] The Court heard oral argument on the motion on April 5, 2019. For the reasons discussed below, the Court grants Defendants' motion.

FACTS

Eastport is a municipality duly organized and existing under the laws of the State of Maine. (Def's Supp'g S.M.F. ¶ 1.) Ms. Abbot has held the position of Eastport City Manager since November 2014 and has held other positions in Eastport since 2011. (Def's Supp'g S.M.F. ¶ 2; Pl's

---

[1] Washington County and its County Manager were originally included in the group of defendants, but these two defendants were dismissed from the action. (*See* Court's Order on Motion for Partial Stipulated Dismissal, entered January 24th, 2018.)

1

Opp. S.M.F. ¶ 2.) The other individually named Defendants are, or were, sitting members of the Eastport City Council at times relevant to this lawsuit. (Def's Supp'g S.M.F. ¶ 6.) MMUSA is a corporation owned by Cory Guimond. (Def's Supp'g S.M.F. ¶ 23; Pl's Add'l S.M.F. ¶¶ 2, 12.)

Eastport owns a building in the City known as the Guilford Mill (or the "Mill"). (Def's Supp'g S.M.F. ¶ 10.) Although the City owns the Guilford Mill, there is no evidence in the summary judgment record that the building serves any civic function. Instead, the City rents out units inside the Guilford Mill to private entities that use the space for business purposes. (Def's Supp'g S.M.F. ¶ 11.) Tenants who lease space in the Guilford Mill are given keys to the property. (Def's Supp'g S.M.F. ¶ 13.) The Mill is not left open to the public by the City, and there is no record evidence that any tenant invited the public at large to visit its unit. (Def's Supp'g S.M.F. ¶ 13; Pl's Opp. S.M.F. ¶ 13.) One side of the Mill contains the Olsen Space and Unit C, which MMUSA leased from the City at different times during the events giving rise to this lawsuit. (Def's Supp'g S.M.F. ¶ 12.) MMUSA rented the Olsen Space and Unit C to build boats in those units. (Pl's Add'l S.M.F. ¶ 3, Def's Reply to Pl's Add'l S.M.F. ¶ 3.) MMUSA's leased sections were not meant to be open to anyone other than its employees. (Pl's Opp. S.M.F. ¶ 13.)

The relationship between Mr. Guimond and Eastport was strained at times over its roughly five-year course. In or around September 2010, the County of Washington, Maine ("Washington County," or the "County") received a grant from the U.S. Economic Development Administration ("EDA") to encourage economic development and provide for job growth in the County. The grant period for using the EDA grant expired in September 2014. (Def's Supp'g S.M.F. ¶ 16.) Originally, Washington County planned for Ocean Renewable Power Company ("ORPC") to accept these grant funds, and the County identified Guilford Mill (which was in disrepair at the time and of little functional use) as a prospective location for a new workspace that would be run by OPRC.

(Def's Supp'g S.M.F. ¶ 18; Pl's Opp. S.M.F. ¶ 18.) In or around July 2011 the City agreed to the planned restoration of Guilford Mill using funds from the EDA grant. (Def's Supp'g S.M.F. ¶ 19; Pl's Opp. S.M.F. ¶ 19.) In late 2012, ORPC decided not to accept the EDA grant funds, nor to move into the Guilford Mill. (Def's Supp'g S.M.F. ¶ 22.) While searching for a new tenant to replace ORPC as a tenant for the Guilford Mill, then-City Manager Jon Southern met Mr. Guimond around November 2012 and invited MMUSA to apply to use funds from the EDA grant. (Def's Supp'g S.M.F. ¶ 23.) Around March 2013 the EDA approved changes to the EDA grant to substitute MMUSA for ORPC and approved a notice to proceed around September 2013. (Def's Supp'g S.M.F. ¶ 24.)

MMUSA rented space in the Guilford Mill from the City between October 18, 2013 and June 27, 2017. (Def's Supp'g S.M.F. ¶ 30.) When MMUSA entered into the lease on October 18, 2013, it was for only the Olsen Space, with the understanding that it could use that space to build smaller boats until renovations on the larger Unit C were complete and MMUSA could commence operations in the larger space. (Def's Supp'g S.M.F. ¶¶ 31, 33.) MMUSA was to pay $1,500 a month under this lease. (Def's Supp'g S.M.F. ¶ 32.)

Things did not go according to plan. The following year, on February 26, 2014, Mr. Guimond told the City he could not build boats in the Olsen Space because of ventilation issues.[2] (Def's Supp'g S.M.F. ¶¶ 34-37.) Roughly a year after that, on March 12, 2015, Ms. Abbott mailed a letter to MMUSA informing it that it was $21,000 in arrears on its rent for the Olsen Space. (Def's Supp'g S.M.F. ¶ 39.) Mr. Guimond objected, and on April 9, 2015, met with the City Council. The City Council agreed to void the October 2013 lease and entered into a new lease with

---

[2] Mr. Guimond claims that he informed the City sooner than that. (Pl's Opp. S.M.F. ¶ 34.) The dispute is not material to any issue presented by this motion.

3

MMUSA for the Olsen Space on May 1, 2015, at $1,3000 a month. (Def's Supp'g S.M.F. ¶¶ 41-42; Pl's Opp. S.M.F. ¶ 41.)

Meanwhile, on January 6, 2014, MMUSA entered into a lease with the City to rent the larger Unit C. (Def's Supp'g S.M.F. ¶ 46.) The terms of that rental agreement gave MMUSA a one-year rent-free period, with the City ultimately agreeing to waive MMUSA's rent until May 2015 because MMUSA did not actually occupy Unit C until May 2014. (Def's Supp'g S.M.F. ¶ 47; Pl's Opp. S.M.F. ¶ 47.) Starting in May 2015, MMUSA was to pay $7,200 a month to rent Unit C and $1,300 a month to rent the Olsen Space. (Def's Supp'g S.M.F. ¶ 50.) Mr. Guimond made several requests for renovations to Unit C and the Olsen Space. (Def's Supp'g S.M.F. ¶¶ 43-45, 52-57.) These requests largely went unheeded by the City, while some were performed by Mr. Guimond himself.[3] (Def's Supp'g S.M.F. ¶¶ 45, 53-57.)

On July 23, 2014, shortly after MMUSA began its boat building operations in Unit C, a fire occurred in the Guilford Mill, causing extensive damage. (Def's Supp'g S.M.F. ¶ 58.) The fire was caused by the spontaneous combustion of volatile materials left inside a boat under construction by MMUSA. (Def's Supp'g S.M.F. ¶ 59.) The cleanup and repair of Guilford Mill following this fire caused more friction between Mr. Guimond and the City, as those restorations resulted in disruptions to MMUSA's operations, and MMUSA did not always comply with requests to move materials and boats out of Unit C because of the attendant disruption. (Def's Supp'g S.M.F. ¶¶ 61-62; Def's Opp. S.M.F. ¶¶ 61-62.) Mr. Guimond and the City also disagreed over whether MMUSA was entitled to be compensated for labor and supplies it used to clean up

---

[3] Why the City did not make the requested changes and whether Mr. Guimond was entitled to compensation for the work he undertook himself is disputed by the parties. (Def's Supp'g S.M.F. ¶¶ 44-45, 53, 55-57; Pl's Opp. S.M.F. 44-45, 53, 55-57.) Mr. Guimond and MMUSA have not sued Defendants for compensation for this work in this lawsuit, so the dispute is immaterial.

4

parts of Unit C after the fire.[4] (Def's Supp'g S.M.F. ¶¶ 63-64.) Finally, the fire was a factor in the City losing insurance coverage for the Guilford Mill, requiring the City to purchase new insurance at double the previous cost. (Def's Supp'g S.M.F. ¶ 60; Pl's Opp. S.M.F. ¶ 60.)

MMUSA failed to pay rent in a timely fashion persistently over the course of its lease with the City between May 2015 and early 2016; by March 2016, MMUSA had stopped paying rent at all.[5] (Def's Supp'g S.M.F. ¶¶ 67-71.) In April 2016, Mr. Guimond delivered a letter to the city council outlining his grievances with respect to his lease at the Guilford Mill; the allegations in Plaintiffs' Complaint more or less mirror the contents of that letter. (Def's Supp'g S.M.F. ¶¶ 72-73.) On April 21, 2016, the City served a notice to quit on MMUSA for its failure to make timely rental payments. (Def's Supp'g S.M.F. ¶ 74.) Attempts to reach a negotiated solution whereby MMUSA could remain at the Guilford Mill failed and the City served a second notice to quit on MMUSA on June 9, 2016. (Def's Supp'g S.M.F. ¶¶ 75-78; Pl's Opp. S.M.F. ¶¶ 76, 78.) On September 23, 2016, the City commenced forcible entry and detainer proceedings against MMUSA; that case reached a negotiated resolution on November 4, 2016 that kept MMUSA in the Olsen Space until June 26, 2017 at a new monthly rate. (Def's Supp'g S.M.F. ¶¶ 79-81.)

The City has limited liability coverage provided by the City's membership in the Maine Municipal Association Property and Casualty Pool, a self-insured municipal risk pool (the "Pool Agreement"). (Def's Supp'g S.M.F. ¶ 84.) Under the Pool Agreement:

> Coverage is limited to those areas for which governmental immunity has been expressly waived by 14 M.R.S.A. § 8104-A, as limited by 14 M.R.S.A. § 8104-B and 14 M.R.S.A. § 8111 . . . . Liability coverage shall not be deemed a waiver of any immunities or limitations of damages available under the Maine Tort Claims Act, other Maine statutory law, judicial precedent, or common law.

---

[4] Plaintiffs have not sued for compensation for this work either, so this dispute is also immaterial.
[5] This is undisputed by MMUSA, with the caveat that Mr. Guimond insists that no rent was due after May 2016 as that was when MMUSA vacated the units. (Pl's Opp. S.M.F. ¶ 71.)

5

(Def's Supp'g S.M.F. ¶ 85.) The City had no policy of liability insurance in effect from July 2, 2014 to present that would provide indemnity for the City for civil liability arising out of the allegations in the Plaintiffs' Complaint. (Def's Supp'g S.M.F. ¶ 86.)[6]

STANDARD OF REVIEW

"Summary judgment is no longer an extreme remedy." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18. Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CityMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). A genuine issue exists where the jury would be required to "choose between competing versions of the truth." *MP Assocs. v. Liberty*, 2001 ME 22, ¶ 12, 771 A.2d 1040. "Summary judgment is appropriate when a defendant is immune from tort liability." *Grossman v. Richards*, 1999 ME 9, ¶ 3, 722 A.2d 371 (citing *Moore v. Lewiston*, 596 A.2d 612, 614 (Me. 1991)). "The person asserting the affirmative defense of immunity bears the burden of proof." *Hilderbrand v. Wash. Cty. Comm'rs*, 2011 ME 132, ¶ 7, 33 A.3d 425.

DISCUSSION

Defendants' principal argument in support of an entry of summary judgment in their favor is that they are absolutely immune from suit as a governmental entity and as employees of a

---

[6] Plaintiffs purport to deny this fact in their opposing statement of material fact. (Pl's Opp. S.M.F. ¶ 86.) However, their denial lacks a record citation in contravention of M.R. Civ. P. 56(h)(2) and therefore Defendants' statement of material fact is deemed admitted. *City of Augusta v. Atty. Gen.*, 2008 ME 51, ¶ 21, 943 A.2d 582. Regardless, Plaintiffs do not argue that the City has any insurance that "provides coverage in areas where the governmental entity is immune" such that it would be "liable in those substantive areas . . . to the limits of the insurance coverage." *See* 14 M.R.S. § 8116.

6

governmental agency pursuant to the Maine Tort Claims Act ("MTCA"). Plaintiffs respond that the MTCA does not apply to their Complaint because their claims sound in contract, or both tort and contract and the overriding relationship was in contract. In the alternative, Plaintiffs argue that an exception to the MTCA's blanket grant of immunity to governmental entities applies, and that the individual defendants are outside the scope of the immunity extended to employees of governmental entities under the MTCA.

The MTCA provides that as a general rule, governmental entities are immune from suit in tort where damages are sought: "Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on *any and all tort claims* seeking recovery of damages." 14 M.R.S. § 8103(1) (emphasis added); *see also New Orleans Tanker Corp. v. Me. Dept't of Transp.*, 1999 ME 67, ¶ 4, 728 A.2d 673 ("The MTCA provides immunity to all governmental entities from suit on *all tort claims* seeking recovery for damages, except as otherwise expressly provided by statute.") (emphasis added) (quotation omitted).[7] Plaintiffs threshold argument in opposition is that the MTCA does not apply to their Complaint at all. In support of this position, Plaintiffs rely on *Mueller v. Penobscot Valley Hosp.*, 538 A.2d 294 (Me. 1988), for the proposition that "the Tort Claims Act clearly does not apply to contract actions. . . ." *Id.* at 297. However, this necessarily begs the question of whether Plaintiffs' claims—each of which alleges the commission of a tort— are "contract actions."

At the outset, Plaintiffs acknowledge that "a clear distinction must be drawn . . . between actions which sound in contract and those which sound in tort." *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 938 (Me. 1982). *Adams* dealt with the necessity of distinguishing between tort and contract claims in light of its holding that lack of privity would no longer constitute a bar to

---

[7] The MTCA also provides employees of governmental entities "absolute immunity from personal civil liability" for specific categories of actions, discussed in more detail below. *See* 14 M.R.S. § 8111(1).

negligence actions brought against a manufacturer. *Id.* at 939. However, the Law Court's basic reasoning in *Adams* is relevant here: torts and contracts arise out of a different kind of relationship (one based on status and one based on consent, respectively) and are thus subject to different rules. *Id.* at 938-39. The MTCA extends immunity to governmental entities only for tort claims (subject to specifically delineated exceptions), not contract claims. *See Mueller*, 538 A.2d at 297. As a result, the principle from *Adams*—that it is necessary to draw a clear distinction between tort and contract actions—tends to undercut, rather than support, Plaintiffs' theory that their claims "sound in both tort and contract." (Def's Opp'n Summ. J. 6, 10.)

Regardless, Plaintiffs go on to argue that in this case the "clear distinction" analysis cuts in their favor because the "overriding relationship was in contract," notwithstanding that they have sued the Defendants only for torts and not for breach of contract. (Def's Opp'n Summ. J. 10.) At the oral argument, Plaintiffs identified the EDA grant as the "contract" at the core of their relationship with Defendants.[8] In essence, Plaintiffs argue that but for the EDA grant, they would never have leased space in the Guilford Mill from the City, or had occasion to interact with the City at all. Plaintiffs thus further argue that their tort claims "sound in contract" and are therefore outside the scope of the MTCA under *Mueller.* Plaintiffs analogize to the principle of products liability law that "when a product causes personal injury or property damage, the harm can legitimately be viewed as a breach of a societal duty sounding in tort, as well as a breach of contractual and warranty duty. . . ." *Arundel Valley, LLC v. Branch River Plastics, Inc.*, No. BCD-CV-13-15, 2014 Me. Bus. & Consumer LEXIS 12, *14-15 (Nov. 5, 2014) (discussing *Oceanside*

---

[8] The parties dispute whether Eastport was a co- or sub-grantee under the EDA grant. (Def's Supp'g S.M.F. ¶ 17; Pl's Opp. S.M.F. ¶ 17; Pl's Add'l S.M.F. ¶¶ 1-2.) However, neither party included the EDA grant in the summary judgment record. Defendants have not even established that the EDA grant is a contract that could support contract claims. In any event, the Court concludes that whether the City was a party to the EDA grant is immaterial to the issue of whether the MTCA applies to Plaintiffs' tort claims..

*at Pine Point Condo. Owners Ass'n v. Peachtree Doors*, 659 A.2d 267, 269-70 (Me. 1995) ("A lawsuit alleging damage or injury from a faulty or defective product may be based on a number of theories, including, *inter alia,* strict liability, negligence, negligent misrepresentation, and breach of warranty.")).

However, even if some of the allegations in Plaintiffs' Complaint could have theoretically supported a claim for breach of contract, that would not remove Plaintiffs' Complaint from the scope of the MTCA. Put simply, Plaintiffs did not bring a claim for breach of contract. If they had, the MTCA would not apply to that claim. *See Mueller*, 538 A.2d at 298 ("the [MTCA] was not intended to apply to causes of action for *breach of contract*.") (emphasis added). Because Plaintiffs allege only tort claims against Defendants, the MTCA applies to those tort claims, irrespective of whether Plaintiffs had a contract with Defendants. Whether Plaintiffs could have sued Defendants for breach of contract, or prevailed in that action, is irrelevant to the question of whether the MTCA applies to the tort claims that the Plaintiffs did allege against the Defendants. Even assuming, as Plaintiffs suggest, that "the overriding relationship was in contract," it does not transmute Plaintiffs' tort claims into claims for breach of contract for purposes of determining whether the MTCA applies.

This conclusion is not contradicted by the authority cited by Plaintiffs. The cases cited, like *Arundel Valley* and *Oceanside*, discussed above, merely stand for the uncontroversial proposition that in some cases, the same factual allegations can potentially form the basis for a lawsuit pursuant to a tort or breach of contract theory. *See Morgan v. Criterium-Mooney Engineers*, CUMSC-CV-2007-381, at 8-9 (Me. Super. Ct., Cum. Cty., Dec. 16, 2009); *Pendleton Yacht Yard, Inc. v. Thomas H.H. Smith*, No. CV-01-047, 2003 Me. Super. LEXIS 49, at *8-9 (March 20, 2003); *see also Int'l Ore & Fertilizer Corp. v. SGS Control Servs*., 743 F. Supp. 250, 258-59 (S.D.N.Y. 1990); Horton

& McGehee, *Maine Civil Remedies* § 15-2(b)(2) at 306-07 (4th ed. 2004) (in some circumstances "a breach [of contract] may be actionable under both tort and contract theory."). None of these cases endorse or even address the novel theory posited by Plaintiffs in this case: that because the factual allegations were (or could have been) the basis for a claim based in tort or breach of contract, the tort claims therefore sound in contract, or both tort and contract, and thus the MTCA does not apply.

In sum, the Court concludes that the MTCA applies to Plaintiffs' tort claims brought in their Complaint and proceeds to analyze whether an exception applies to the blanket immunity afforded governmental entities under that Act.

The exceptions to governmental entity immunity are listed in 14 M.R.S. § 8104-A.[9] The prefatory language to section 8104-A provides that a governmental entity "is liable for property damage, bodily injury or death" if one of the exceptions applies. In this case, Plaintiffs do not allege that Defendants are responsible for property damage, bodily injury, or death. They allege only economic harm stemming from the Defendants' allegedly tortious behavior. (*See* Pl's Compl. ¶¶ 44, 76.) The very limited evidence of harm in the summary judgment record demonstrates, at best, strictly economic harm. (Pl's Add'l S.M.F. ¶¶ 6(b), 17, 22, 26.) Thus, regardless of whether an exception under section 8104-A would otherwise apply, Eastport is immunized from liability because Plaintiffs neither allege nor adduce evidence of liability for property damage, bodily injury, or death.

Even if Plaintiffs could get past the threshold issue of damages, Plaintiffs' arguments for an exception to immunity are not persuasive. The public building exception, 14 M.R.S. § 8104-

---

[9] 14 M.R.S. § 8116 also provides for a limited exception to immunity whereby if a governmental entity's insurance policy provides coverage in areas where the governmental entity would otherwise be immune, the governmental entity is liable in those substantive areas to the limits of the insurance coverage. It is undisputed that Eastport's insurance policy does not provide coverage applicable to the claims alleged in this lawsuit. (Def's Supp'g S.M.F. ¶¶ 84-86.)

A(2) provides that "[a] governmental entity is liable for its negligent acts or omissions in the construction, operation or maintenance of any public building or the appurtenances to any public building." The statute lists exceptions to the exception that exclude certain structures from the definition of "public building," such as dams and properties acquired by tax delinquency or eminent domain for a certain period. *See generally id.* § 8104-A(2)(A)(4). "The MTCA, however, provides no further definition of public building, and there is no other definition appearing in any other section of the Maine Revised Statutes." *Rodriguez v. Town of Moose River*, 2007 ME 68, ¶ 28, 922 A.2d 484. Plaintiffs argue that their claims relate to the "operation or maintenance of [a] public building," specifically, the Guilford Mill. *See* 14 M.R.S. § 8104-A(2). Defendants argue that the Guilford Mill is not a public building under the MTCA.

"[I]mmunity is the rule and exceptions to immunity are to be strictly construed." *New Orleans Tanker Corp. v. Me. Dep't of Transp.*, 1999 ME 67, ¶ 5, 728 A.2d 673. *See also Clifford v. Me. Gen. Med. Ctr.*, 2014 ME 60, ¶ 49, 91 A.3d 567 (MTCA "strictly construe[d] . . . because it was enacted in derogation of common law."). Through this analytical lens, the Court concludes that the public building exception does not apply to Plaintiffs' claims against the Defendants.

Both parties cite *Rodriguez* for its definition of public building: "A 'public building' is '[a] building that is accessible to the public; esp[ecially] one owned by the government' . . . . the function a building performs and its character in relation to the public are important factors in determining whether a building is 'public.'" 2007 ME 68, ¶¶ 32-33, 922 A.2d 484 (quoting *Black's Law Dictionary* 1243 (7th ed. 1999)) (citing *Adriance v. Town of Standish*, 687 A.2d 238 (Me. 1996)). In *Rodriguez*, the Law Court recognized that whether a building is a "public building" depends on the "specific facts of [the] case," with recourse to the factors identified above. *Id.* ¶ 35.

In this case, the Mill could be considered the inverse of the building in *Rodriguez*. In that

11

case, the building in question was not owned by the government but was rather the privately-owned home of a town employee: the town clerk of Moose River, Maine. *Id.* ¶¶ 3-4. However, it was nonetheless open to the public, because that was where the town clerk conducted her official duties. *Id.* As such, "[t]he residents of the Town had no choice but to go to [the] home to perform legally necessary Town business, such as registering motor vehicles and paying taxes. [The town clerk] put a sign on her home [and] allowed residents to come into her home to conduct official Town business[.]" *Id.* ¶ 33. The Law Court decided that based on those facts and other circumstances, the town clerk's home was a public building for purposes of the MTCA. *Id.* ¶ 35.

Here, there is no dispute that the Guilford Mill is owned by the City. (Def's Supp'g S.M.F. ¶ 10.) However, this is the only evidence to support a conclusion that the Mill is a public building, and public ownership is neither a necessary nor sufficient condition to prove that a building is a "public building" under the MTCA. *See id.*, *see also Lovejoy v. State*, 544 A.2d 750, 751 (Me. 1988). First, there is no *genuine* dispute that the Mill is not "accessible to the public." *See id.* ¶ 32. "[T]here is a genuine issue when there is *sufficient evidence* for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy*, 2012 ME 103, ¶ 11, 48 A.3d 774. Defendants have adduced evidence to support the factual proposition that the Mill is not open to the public. (Def's Supp'g S.M.F. ¶ 13.) Plaintiffs purport to dispute this fact, but concede that they are without knowledge as to whether any portion of the Mill is open to the public at any time. (Pl's Opp. S.M.F. ¶ 13.) At oral argument, Plaintiffs were able to articulate many public purposes for which the Mill *could* be used, whether by the City itself or a civic organization, but conceded that it had no evidence that the City or any private civic organization ever made use of any portion of the Mill for events that were open to the public. Plaintiffs have not adduced any evidence to

12

generate a genuine dispute as to whether the Mill was accessible to the public.[10]

Relatedly, there is no evidence that the building serves any civic function. The City's use of the Mill is limited to renting out units to private entities. (Def's Supp'g S.M.F. ¶ 13; Pl's Opp. S.M.F. ¶ 13.) The Guilford Mill's function and character with respect to the city is therefor distinguishable from the town clerk's home in *Rodriguez*, where the building in question was really something akin to a rural town hall. *Rodriguez*, 2007 ME 68, ¶¶ 4, 34-35, 922 A.2d 484. Thus, the function Guilford Mill performs and its character in relation to the public cut in favor of a conclusion that it is not a public building, notwithstanding the fact that it is owned by the government, and regardless of whether it is accessible to some limited extent by business invitees of tenants.[11] *Id.* ¶¶ 32-35. *Accord Lovejoy*, 544 A.2d at 751 (deciding that assault shelter was not a public building notwithstanding the fact that it was publicly owned).

However, even if the Guilford Mill is a "public building" under the MTCA, the City is still entitled to immunity under an exception to the public building exception found in section 8104-B(6). Under that section, "[n]otwithstanding section 8104-A, a governmental entity is not liable for any claim which results from: . . . . The leasing of governmental property, including buildings, to other organizations[.]" 14 M.R.S. § 8104-B(6). Plaintiffs' only argument in opposition is that section 8104-B(6) is bad policy because it would result in no private businesses leasing space from

---

[10] It is undisputed that the Guilford Mill is visible from the road and that Eastport's public works director had a key to access all areas of the Mill and would inspect the entire building from time to time. (Def's Add'l S.M.F. ¶¶ 23- 24.) At the oral argument, Plaintiffs cited these facts as evidence supporting the conclusion that the Mill is a public building. The Court disagrees that these facts are relevant to the analysis. The issue is whether the building is "accessible by the public;" whether the building is accessible by municipal employees and visible to the public is irrelevant. *Rodriguez*, 2007 ME 68, ¶ 32, 922 A.2d 484. It is likewise irrelevant to a determination of "the function [the] building performs and its character in relation to the public," the two "important factors" identified by the Law Court in *Rodriguez*. *Id.* ¶ 33.

[11] As noted above, to be clear, there is no record evidence that any tenant invited the public at large to visit it in its leased portion of the Mill. The only record evidence, from Plaintiffs' own opposing statement of material fact, is that MMUSA's leased sections were *not* meant to be open to anyone outside of its employees. (Def's Opp. S.M.F. ¶ 13.) At the oral argument, Plaintiffs could only speculate that some tenants "would" have invited prospective customers to visit their businesses, and refused to meaningfully respond to the query as to whether those same tenants could exclude the public as well.

the government. "[I]t is the Legislature's role to weigh the competing policy interests, not the role of the Court[.]" *Norton v. Hall*, 2003 ME 118, ¶ 24, 834 A.2d 928 (Saufley, C.J., concurring). Plaintiffs also fault Defendants for relying on a plain language interpretation of 14 M.R.S § 1804-B(6) without recourse to relevant case law. The Court's research on this subsection of the statute has turned up a citation in a single Law Court case that was decided on other grounds. *See Wilcox v. City of Portland*, 2009 ME 53, ¶ 7, 970 A.2d 295. In any event, Defendants' plain language argument trumps Plaintiffs' policy argument. *See, e.g. Wawenock, LLC v. Me. Dep't of Transp.*, 2018 ME 83, ¶ 7, 187 A.3d 609 ("The first and best indicator of legislative intent is the plain language of the statute itself."). Whatever its reasoning, our Legislature clearly indicated its intent to extend immunity to governmental entities for claims resulting from the leasing of governmental property, including buildings. It is not the Court's function to second-guess that decision.

Plaintiffs cannot have it both ways. Their entire relationship with the Guilford Mill was subject to the lease agreements that they had with the City. If Plaintiffs' claims arise from negligent acts or omissions in the construction, operation, or maintenance of the Guilford Mill or the appurtenances to the Guilford Mill—a dubious notion, but the theory Plaintiffs have put forward in this case to salvage their claims from the blanket immunity for governmental entities provided for in the MTCA—the claims also can only have resulted from MMUSA's leasing of the government building. Section 8104-B(6) of the MTCA thus operates to extend immunity to the City, "[n]otwithstanding section 8104-A" and any exceptions to immunity provided therein, including section 8104-A(2).

In sum, the Court concludes that the Guilford Mill is not a public building and, in the alternative, even if it were, Plaintiffs' claims necessarily would result from their lease of space in the Mill and the "exception to the exception" provided for in section 8104-B(6) would apply. The

City is therefore entitled to immunity from the Plaintiffs' tort claims under the MTCA.

This does not resolve the issue of the individual defendants' immunity from Plaintiffs' tort claims. Unlike governmental entities, employees of governmental entities are not afforded blanket immunity subject to specifically delineated exceptions. *See Carey v. Bd. of Overseers of the Bar*, 2018 ME 119, ¶ 21, 192 A.3d 589 (quoting *Day's Auto Body, Inc. v. Town of Medway*, 2016 ME 121, ¶ 20, 145 A.3d 1030.) ("'[L]iability is the rule and immunity the exception' when it comes to employees of governmental entities.") Instead, governmental employees are extended "absolute[] immun[ity] from personal civil liability" for specific categories of actions they may take. 14 M.R.S. § 8111(1). Governmental employees enjoy immunity from personal civil liability for, inter alia, "[u]ndertaking or failing to undertake any legislative or quasi-legislative act," "[u]ndertaking or failing to undertake any judicial or quasi-judicial act," and "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused, and whether or not any [law] . . . under which the discretionary function or duty is performed is valid." 14 M.R.S. § 8111(1)(A)-(C); *see also Grossman v. Richards*, 1999 ME 9, ¶ 4, 722 A.2d 371 ("The MTCA grants absolute immunity to governmental employees for performing or failing to perform any discretionary function or duty.") (quotation omitted). Furthermore, governmental employees enjoy immunity from suit for "[a]ny intentional act or omission within the course and scope of employment; provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith. . . ." *Id.* § 8111(1)(E); *see also Hinkley v. Penobscot Valley Hosp.*, 2002 ME 70, ¶ 6 n.3, 794 A.2d 643.

There is no dispute that all of the individual defendants are governmental employees under the MTCA. *See* 14 M.R.S. § 8102(1). The individual liability of these defendants is so poorly articulated by Plaintiffs, that they have failed to carry their burden as plaintiffs confronting a

defendant's summary judgment motion to "establish a prima facie case for each element of [their] cause of action," regardless of whether the individual defendants enjoy personal immunity under the MTCA. *Addy v. Jenkins, Inc.*, 2009 ME 46, ¶ 8, 969 A.2d 935; *see also Reliance Nat'l Indem. v. Knowles Indus. Servs. Corp.*, 2005 ME 29, ¶ 9, 868 A.2d 220 ("When a plaintiff has the burden of proof on an issue, a court may properly grant summary judgment in favor of the defendant if it is clear that the defendant would be entitled to a judgment as a matter of law if the plaintiff presented nothing more than was before the court at the summary judgment hearing."). Regardless, to the extent that Plaintiffs have named the individual city councilors as a "proxy" for Eastport with respect to their multiple grievances against the City's role as landlord, the actions taken by the city council as a body politic are the kinds of legislative and judicial functions for which the individual members are afforded absolute personal immunity. *See* 14 M.R.S. § 8111(1)(A)-(B).

Plaintiffs adduce some modestly specific evidence with respect to Ms. Abbott's actions: that she failed to provide them with a fire safety inspection report in a timely manner[12] based on her low opinion of Mr. Guimond, and shared the amount MMUSA was in arrears for lease payments to the City in response to a request from the *Quoddy Tides*. (Pl's Add'l S.M.F. ¶¶ 19-21.) But this evidence is far too little to take Ms. Abbott's actions outside the scope of the MTCA immunity. Notably, Plaintiffs do not even claim that Ms. Abbot misrepresented the amount of MMUSA's arrearage to the *Quoddy Tides*. (*See* Pl's Add'l S.M.F. ¶ 21.)

Defendants argue convincingly that Ms. Abbott's actions were discretionary, and she can therefore not be held personally liable for them under 14 M.R.S. § 8111(1)(C). Pursuant to statute, Ms. Abbott—in her position as city manager—is the "chief executive and administrative official

---

[12] As explained below, Ms. Abbott had broad discretion in the performance of her duties as city manager. Even if, in the abstract, Ms. Abbott took "too long" to provide the fire inspection report to Mr. Guimond—something Plaintiffs adduce virtually no evidence to support—she had discretion to determine the priority Mr. Guimond's request should have been accorded over her other duties.

of the [City]." 30-A M.R.S. § 2636(1). There can be no doubt that Ms. Abbott was "required to exercise judgment or discretion in performing [her] official duties." 14 M.R.S. § 8111(1). Responding to media requests would at least be "reasonably encompassed within [her] job duties," despite there being no specific authorization granting her discretion to do so (or decline to do so). *Id.* The act Plaintiffs complain of seems to be precisely the kind of discretionary act for which the Legislature chose to insulate governmental employees:

> The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits . . . . [T]ort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function.

*Hilderbrand v. Wash. Cty. Comm'rs*, 2011 ME 132, ¶ 8, 33 A.3d 425(citing *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 425 (Me. 1987) (quoting Restatement (Second) of Torts § 895D comment b (1979))).

The facts and holding in *Hilderbrand*, which was likewise decided on summary judgment, are instructive in the instant case. There, as here, the discretionary act complained of was the decision to make public comments that allegedly caused the plaintiff harm. *Hilderbrand*, 2011 ME 132, ¶¶ 4-6, 33 A.3d 425. The Washington County sheriff publicly announced that his department would no longer work with the Maine Drug Enforcement Agency ("MDEA") based on a video he had watched showing an MDEA agent acting inappropriately. *Id.* The sheriff specifically noted the agent's conduct as the reason his office would no longer work with the MDEA. *Id.* ¶ 4. The Law Court analyzed both decisions—the decision to end his department's cooperation with the MDEA and his decision to share his reasoning publicly—in tandem. *Id.* ¶¶

17

13-17. The Law Court ultimately determined that both were discretionary acts for which he was entitled to immunity under 14 M.R.S. § 8111(1)(C). *Id.* ¶ 20.

With respect to the sheriff's public comments specifically, the Law Court noted that his "immunity from liability for his public comments may be broader than that of many government employees because of the broad scope and course of his job." *Id.* ¶ 18. Earlier in the opinion, the Law Court cites 30-A M.R.S. § 401(1) for this proposition, which provides that: "The sheriff shall act as the chief county law enforcement officer and is responsible for administering and directing the sheriff's department as authorized by the county budget. The sheriff shall inform the county commissioners of sheriff's department activities on a regular basis." *Hilderbrand*, 2011 ME 132, ¶ 11, 33 A.3d 425. The "broad scope and course" of the sheriff's job described in 30-A M.R.S. § 401(1) is analogous to the language of the statute that provides Ms. Abbott's job description as city manager. "The town[13] manager . . . [i]s the chief executive and administrative official of the town . . ; [i]s responsible to the selectmen for the administration of all departments and offices over which the selectmen have control . . ; shall execute all laws and ordinances of the town. . . . ." 30-A M.R.S. § 2636(1)-(3); *see generally id.* § 2636. While the powers and duties of the city manager are described with more specificity than that of the county sheriff, both jobs have a "broad scope and course . . . " under the statutes describing their function. *See Hilderbrand*, 2011 ME 132, ¶ 18, 33 A.3d 425. Under *Hilderbrand*, Ms. Abbott therefor enjoys "immunity from liability for [her] public comments [that] may be broader than that of many government employees . . . ." *Id.* This rule makes sense, because as noted above, responding to media requests fits easily within

---

[13] The Law Court has previously assumed, without discussion, that the predecessor statute to section 2636 (30 M.R.S.A. § 2317(1)(N) (1978), *repealed by* P.L. 1987, ch. 737, §A.1) applies to city managers as well as town managers. *See Chapman v. Rockland*, 524 A.2d 46, 47 (Me. 1987).

18

the broad powers and duties of the city manager provided for in 30-A M.R.S. § 2636.

At the oral argument, Plaintiffs pressed an alternative argument, without conceding that it was within Ms. Abbott's discretionary authority to respond to media requests, that she nonetheless had an obligation to be "fair and objective" in sharing public information. Specifically, Plaintiffs argued that Ms. Abbott "left information out" about MMUSA's problems with the Mill and grievances against the City that explained MMUSA's refusal to pay rent. To the extent that Plaintiffs argue that Ms. Abbott therefore abused her discretion by the manner in which she responded to the *Quoddy Tides*, Ms. Abbott is nonetheless entitled to absolute immunity under the plain language of 14 M.R.S. § 8111(1)(C) (governmental employees "absolutely immune" for "[p]erforming or failing to perform any discretionary function or duty, *whether or not the discretion is abused . . . .*"). Plaintiffs fare no better under the argument that it was bad faith for Ms. Abbott to provide the *Quoddy Tides* only the amount of MMUSA's arrearages and not any mitigating circumstances. Even if Ms. Abbott's decision about what information to share was motivated by bad faith, she is still insulated by discretionary function immunity under section 8111(1)(C). *See Grossman v. Richards*, 1999 ME 9, ¶ 9, 722 A.2d 371 ("the 'bad faith' provision in section 8111(1)(E) does not apply to discretionary act immunity under section 8111(1)(C)); *see also Darling*, 535 A.2d at 425 (explaining purpose for the rule).

Regardless, Plaintiffs have not adduced any evidence of "bad faith" on the part of Ms. Abbott. Plaintiffs' only evidence of "bad faith" is the undisputed fact that Ms. Abbott's relationship with Mr. Guimond had "soured" at some point prior to her response to the *Quoddy Tides*. (Pl's Add'l S.M.F. ¶¶ 19-20; Def's Reply to Pl's Add'l S.M.F. ¶¶ 19-20.) More is required to demonstrate bad faith on Ms. Abbott's part. *See, e.g., Lyons v. City of Lewiston*, 666 A.2d 95, 101-02 (Me. 1995). Plaintiffs do not claim that Ms. Abbott's response to the *Quoddy Tides* was not

made in her capacity as city manager. Thus, even if deciding to respond to a particular media request in a certain way was outside of the discretion afforded a city manager, Ms. Abbot nonetheless enjoys absolute immunity for this indisputably intentional act performed within the course and scope of her employment. 14 M.R.S. § § 8111(1)(E).

Defendants have raised two other arguments in support of summary judgment: 1) that Plaintiffs failed to timely provide them with a notice of claim under the MTCA, with the effect of barring all claims that arose after October 4, 2015,[14] *see* 14 M.R.S. § 8107(1); and 2) that Plaintiffs have not adequately adduced evidence[15] of fraud on the part of any Defendant. These theories are alternative bases on which to grant partial summary judgment in Defendants' favor. However, because every Defendant is absolutely immune from liability for each of the Plaintiffs' causes of action under the MTCA, the Court need not address these other arguments in detail.

CONCLUSION

For all the foregoing reasons, the entry will be:

Defendants' motion for summary judgment is granted on all counts of the Complaint.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: _April 12, 2019_____          ____s/_____
                                            Michael A. Duddy
                                            Judge, Business and Consumer Court

---

[14] Plaintiffs' only argument in opposition to this proposition is that the MTCA does not apply to their claims at all because the overrinding relationship was in contract, an argument that the Court rejects for the reasons given above.
[15] Plaintiffs are technically correct that the procedural window for challenging the adequacy of the allegations of fraud has closed. However, this does not relieve Plaintiffs of their burden on summary judgment to adduce prima facie evidence of each and every element of their causes of action in order to prevail on a defendant's motion for summary judgment. *See Addy*, 2009 ME 46, ¶ 8, 969 A.2d 935. If anything, their burden at this stage is a heavier one, and a burden they have failed to carry. For example, Plaintiffs have adduced no evidence whatsoever of a false statement made by any Defendant, or the provision of false information by any Defendant—a necessary element of intentional misrepresentation and negligent misrepresentation, respectively. *Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280; *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996).

CORY GUIMOND, et. al,       )
                            )
            Plaintiff,      )
                            )
v.                          )          ORDER DENYING PLAINTIFF'S
                            )          REQUEST FOR RECONSIDERATION
                            )
CITY OF EASTPORT, et. al.,  )
                            )
            Defendants      )

By Order dated October 26, 2018, the Court (J. Stewart) denied Plaintiffs' Motion to Amend Complaint. On November 2, 2018, Plaintiffs filed a Motion for Reconsideration. The case was subsequently transferred to the Business and Consumer Docket ("BCD") before the Motion for Reconsideration was decided. The Motion is now pending before the BCD Court (J. Duddy).

Except in unusual circumstances, the original judge issuing an order is the judge that should handle a motion for reconsideration. In re Child of Tanya C., 2018 ME 153, ¶ 9, n.4. In this case, however, the usual procedure is impracticable because of the intervening transfer to the BCD Court. All parties have consented to having the BCD Court decide the Motion for Reconsideration, even though the BCD Court did not issue the original Order. Hence, this case presents the kind of unusual circumstance that allows a different judge to decide the Motion for Reconsideration.

The Court has carefully reviewed the pleadings in this matter, along with the relevant chronology of filings. The Court has also carefully reviewed the original Order, along with the Motion for Reconsideration and the Opposition. The original Court's Order appears to be well founded. Plaintiff was accorded adequate due process. The original Court did not commit prejudicial error nor impede substantial justice. Cates v. Farrington, 423 A.2d 539, 541 (Me. 1980). Accordingly, Plaintiff's Motion for Reconsideration is Denied.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

So Ordered.

February 8, 2019.

_____
Michael A. Duddy
Judge, Business and Consumer Docket

2